IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-cv-22551-GAYLES

**OSCAR ORLANDO QUINTERO JAIMES,**

    **Petitioner,**

v.

**LUCERO MILEYDI GIL TAVERA,**

    **Respondent.**

_____/

**ORDER**

THIS CAUSE came before the Court on Petitioner's Verified Petition for the Return of Minor Child to Colombia Pursuant to the Hague Convention on International Child Abduction (the "Petition"). [ECF No. 1]. The Court has considered the Petition, the record, and the evidence presented at the final hearing on August 22 and September 5, 2025 (the "Final Hearing") and is otherwise fully advised. For the reasons set forth below, the Petition is granted.

**I.    INTRODUCTION**

Petitioner Oscar Orlando Quintero Jaimes ("Petitioner") brings this action against Respondent Lucero Mileydi Gil Tavera ("Respondent") seeking the return of their eleven-year-old child ("JQG") to Colombia under the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 (the "Convention").[1]

"[T]he Convention's core premise [is] that 'the interest of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of

---

[1] It is undisputed that the United States and Colombia are signatories to the Convention.

'habitual residence.'" *Monasky v. Taglieri,* 589 U.S. 68, 72 (2020) (quoting Convention Preamble, at 7). To effectuate this purpose, the Convention "ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which [he] habitually resides." *Id.* In the United States, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, grants federal district courts jurisdiction to review petitions under the Convention. However, in considering a petition, courts may "determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); *see also Bassat v. Dana*, No. 25-10915, 2025 WL 2304896, at *6 (11th Cir. Aug. 11, 2025) (holding that "[a]lthough federal courts evaluating ICARA petitions have jurisdiction over the wrongful-removal claim, [they] cannot decide the underlying custody dispute."). The Court, therefore, serves "as a gatekeeper [to decide] which of the contracting states is the proper forum in which the issue of custody should be decided." *Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018) (internal quotation omitted).

## II.   FINDINGS OF FACT

Based on the testimony and evidence presented at the Final Hearing, the Court makes the following findings of fact.[2]

In 2014, Petitioner and Respondent welcomed the birth of JQG in Bucaramanga, Colombia. Though not married, Petitioner and Respondent were living together. In 2016, Respondent moved with JQG to Bogota, Colombia to begin a new job,[3] and Petitioner began paying Respondent child

---

[2] In addition to fact witnesses, the Court heard testimony from Dr. Miguel Firpi ("Dr. Firpi"), a licensed clinical psychologist specializing in child psychology. Dr. Firpi interviewed JQG, Petitioner, and Respondent before the Final Hearing and prepared a report. [ECF No. 58-25]. After reviewing the evidence, including Dr. Firpi's report and testimony, the Court determined that JQC's testimony was not necessary.

[3] At the Final Hearing, Respondent testified that she moved to Bogota because Petitioner had pulled her hair and pushed her to the ground. However, in her interview with Dr. Firpi, Petitioner said that she moved to Bogota to pursue a job and "denied [Petitioner] ever hit her." [ECF No. 58-23 at 6]. Respondent's mother testified that Petitioner abused Respondent but later conceded that she was unaware that Respondent told Dr. Firpi the opposite.

support.[4] Petitioner would occasionally travel to Bogota to gather JQG and bring him back to Bucaramanga for one to two-week visits. During these visits, JQG would stay with Petitioner in his parents' home.

### A.  The Conciliation Agreement

When Respondent and JQG were living in Bogota, Petitioner initiated custody proceedings in the Ninth Peace Court in Floridablanca, Colombia. On August 24, 2017, as a part of these proceedings, Petitioner and Respondent entered into a custody agreement (the "Conciliation Agreement") which grants them shared custody of JQG, gives Petitioner visitation rights, and requires Petitioner to pay Respondent monthly child support.[5] Notably, the Conciliation Agreement prohibits Respondent from "transfer[ring] [JQG] to another city in Colombia (other than Bucaramanga) or abroad without the authorization of [Petitioner] . . . ." [ECF No. 58-3 § 6].

### B.  2018 Incident in Bucaramanga

In January 2018, Respondent and JQG visited Bucaramanga without notifying Petitioner. Upon learning that his son was in Bucaramanga, Petitioner obtained an order from the Commissioner of the Family House of Justice instructing Respondent to follow the terms of the Conciliation Agreement, including complying with Petitioner's visitation rights (the "Order"). [ECF No. 58-14]. Order in hand, Petitioner found Respondent and her then-husband, Richard Alexander Peinado Rivera ("Mr. Rivera"), at a local gym.[6] It is undisputed that the parties had an altercation involving pushing, shoving, and harsh words. JQG was not present.

---

[4] Petitioner also began paying for JQG's healthcare coverage.
[5] Petitioner continued to pay Respondent child support after Respondent retained JQG in the United States.
[6] In conjunction with her proposed Findings of Fact and Conclusions of Law, [ECF No. 60], Respondent submitted Mr. Rivera's "Sworn Statement." [ECF No. 60-4]. Because the statement is unsigned, the Court will not consider its substance. Though Respondent had the opportunity to call Mr. Rivera as a witness, and he signed into Zoom for the Final Hearing, he became unavailable to testify. In any event, the Court found that his proffered testimony would be cumulative.

Respondent filed a criminal complaint in Colombia against Petitioner based on the altercation at the gym. [ECF No. 14-1 at 7].[7] In response, the Floridablanca police issued a Measure of Caution and Immediate Protection (the "Protective Measure") requiring Petitioner to "ABSTAIN[] from verbal aggression anywhere, as well as any other conduct that attacks [Respondent's] honor and good name." *Id.* at 8. Respondent's complaint was set for a hearing, but the case was closed after Respondent failed to appear for the hearing. Petitioner also filed a criminal complaint against Respondent and Mr. Rivera based on the incident at the gym. [ECF No. 58-16]. Petitioner's case was set for a hearing and, again, Respondent failed to appear. Petitioner ultimately decided not to pursue his complaint.

Following the January 2018 incident, JQG continued to regularly visit Petitioner in Bucaramanga. There is nothing in the record to suggest that Respondent protested these visits or feared for her son's safety or welfare.

### C. Respondent and JQG Return to Bucaramanga

In early 2021, Respondent and JQG moved back to Bucaramanga. JQG often visited and spent weekends with Petitioner who was living with his parents and sister, Yeny Quintero ("Yeny").[8] During those visits, Petitioner drove JQG to school and his extracurricular activities. The pair played soccer, hiked in the mountains, and went to the movies. Petitioner also paid for JQG's private school tuition and extracurricular activities.

Following her return to Bucaramanga, Respondent visited the United States, without JQG, on three separate occasions. When Respondent was traveling, JQG stayed with Petitioner.

---

[7] At the Final Hearing, Respondent also testified about a second, related incident that occurred in a park the same day as the incident at the gym during which Respondent, Petitioner, and Petitioner's parents argued about JQG. Respondent did not reference the park incident in her report to the police.
[8] JQG stayed in Petitioner's bedroom during his visits. Petitioner's family has now added an extra room to their home for JQG. Respondent testified, without support, that Petitioner's family home was in a dangerous neighborhood. Petitioner and Yeny both testified that the neighborhood is safe.

4

At the Final Hearing, Respondent asserted, for the first time, that Yeny's then-boyfriend sexually assaulted JQG during one of JQG's visits with his father.[9] Respondent provided no details about alleged assault, and it does not appear that she ever reported it to law enforcement. Respondent's mother testified that JQG told her about the alleged assault. Petitioner denies ever hearing about this alleged incident, and Yeny testified that she never left JQG alone with her boyfriend. Respondent did not mention any abuse of JQG in her Answer to the Petition, Amended Answer, or interview with Dr. Firpi. JQG did not tell Dr. Firpi about a sexual assault.

**D.  Respondent Brings JQG to the United States**

In June 2023, Petitioner authorized Respondent to bring JQG to the United States to visit Disney World. In preparation, Petitioner and Respondent signed a Travel Authorization Form stating that the trip was a vacation and JQG would return to Colombia on July 17, 2023 (the "Travel Authorization"). [ECF Nos. 58-17]. On July 17, 2023, Respondent informed Petitioner that she and JQG would not be returning to Colombia.

**E.  JQG's Life in Miami**

Since arriving in the United States, Respondent and JQG have lived in four different residences in Miami. During the first year, they moved from a friend's apartment to a rented single room to a rented efficiency apartment. Respondent and JQG currently live in a two-bedroom apartment that belongs to her friend. Respondent testified that she has a sublease for the apartment but has no formal lease or rental agreement. On June 10, 2025, she told a therapist that she was experiencing housing instability and living with friends. Although Respondent had a car when she first arrived in the United States, she no longer has a valid driver's license or a car.

---

[9] Respondent also alleged that Yeny's then-boyfriend's son bullied JQG.

5

In March or April 2025, Respondent married Andres Naranjo ("Naranjo"). Naranjo filed for divorced a month later. Respondent sought psychological treatment following the marriage, during which she reported that Naranjo sexually assaulted her. The report from that treatment notes that Respondent suffers from major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and insomnia.

Respondent currently works full-time with children with disabilities and has other freelance jobs. If Respondent is not home when JQG returns from school, her friend watches him.

JQG attends Frederick Douglas Elementary School. Although he is an average student and successfully completed the fourth grade, JQG was absent from school twenty (20) days and tardy fifty-six (56) times during the 2023-2025 school years. JQG has three good friends, all of whom are Hispanic and two of whom are Colombian. JQG played in a soccer league but recently stopped because Respondent could no longer afford to pay the fees. He takes music classes after school. JQG has not seen a physician or dentist for care since coming to the United States.

Respondent and JQG's legal status in the United States is unclear. In October 2024, Respondent filed an application with United States Citizenship and Immigration Services ("USCIS") seeking asylum in the United States for herself and JQG. The 2018 incident is the sole basis for Respondent's asylum application. As of the date of the Final Hearing, the application is pending.

When JQG first arrived in the United States, he would regularly talk to Petitioner via phone or video chat. During these calls, JQG often stated that he wanted to return to Colombia and was lonely and sad in the United States.[10]

---

[10] Petitioner produced recordings of some of these calls, one of which also includes Respondent's mother.

JQG told Dr. Firpi that Petitioner never hurt him and that he had never seen Petitioner physically abuse Respondent.[11] He also told Dr. Firpi that he preferred to remain in the United States to take advantage of its opportunities and be with his mother. Dr. Firpi testified that JQG's awareness of these proceedings and desire to protect his mother, combined with Respondent's derogatory comments about Petitioner and Colombia, likely influenced JQG's preference.[12]

### F. Bucaramanga Today

Petitioner continues to live with his parents and Yeny in a four-bedroom house in Bucaramanga. He makes his living as a photographer and videographer.

Petitioner's entire extended family, including JQG's paternal aunts, uncles, and cousins, live in Bucaramanga. Respondent's extended family, including her parents and JQG's maternal cousins, aunts, and uncles, also live in Bucaramanga. Before coming to the United States, JQG regularly interacted with his extended family in Bucaramanga.

### G. Petitioner's Efforts for the Return of His Son

Five days after Respondent informed Petitioner that she and JQG would not be returning to Colombia, Petitioner filed an application under the Convention for the return of his son with the Colombian authorities. [ECF No. 58-18]. Petitioner also provided a letter to the Colombian authorities explaining the circumstances of JQG's retention in the United States (the "Motivation Letter"). [ECF No. 58-19]. On June 25, 2024, July 31, 2024, January 8, 2025, and March 6, 2025, the United States State Department sent letters to Respondent informing her of Petitioner's Hague application (the "Voluntary Return Letters"). [ECF No. 1-7]. Respondent ignored the Voluntary Return Letters.

---

[11] JQG acknowledged that he had seen his parents argue.
[12] JQG also told Dr. Firpi that when U.S. Marshals came to his home to serve the Petition on Respondent, he was scared and thought Petitioner was attempting to have Respondent deported.

7

### H. This Action

On June 5, 2025, Petitioner filed this action arguing that the Convention and ICARA mandate that JQG return to Colombia for all custody determinations. [ECF No. 1]. On July 3, 2025, Respondent, proceeding *pro se*, filed her Answer raising the exceptions/affirmative defenses of well-settled child, consent, and grave risk of harm. [ECF No. 14]. Respondent filed an Amended Answer on July 15, 2025, alleging that the 2018 incident places JQG at a grave risk of harm should he return to Colombia. Following the Final Hearing, the parties each filed proposed findings of fact and conclusion of law. [ECF Nos. 59, 60]. In Respondent's post-hearing briefing, she raised the mature child defense in addition to those already raised in her Answer.[13]

## III. LEGAL STANDARD

The Court uses a burden-shifting framework to review petitions under the Convention. First, Petitioner must prove, by a preponderance of the evidence, that (1) at the time of the wrongful retention, JQG was a habitual resident of Colombia; (2) the retention breached Petitioner's rights under Colombian law; and (3) Petitioner was exercising his custody rights at the time of the retention. *See Bassat*, 2025 WL 2304896, at *6. If Petitioner establishes his prima facie case, JQG must return to Colombia unless Respondent can establish any of the following exceptions or affirmative defenses:

> 1) the child is now settled in the new environment; 2) the person in the care of the child was not actually exercising custody rights at the time of removal, or subsequently consented to or acquiesced in the removal; 3) the child objects to the return and is mature enough to have their objection considered; 4) there is a grave risk that return would expose the child to physical or psychological harm or otherwise intolerable situation; or 5) the return of the child would not be permitted under the fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.

---

[13] Respondent appeared *pro se* at the Final Hearing. Her counsel appeared after the Final Hearing and filed Respondent's post-trial briefing.

*Rivero v. Godoy*, No. 18-23097, 2018 WL 7577757, at *2 (S.D. Fla. Oct. 12, 2018). Respondent must prove the first three exceptions by a preponderance of the evidence and the last two by clear and convincing evidence. *Id.* at *2 n.1.

The Convention's exceptions to return are "construed narrowly so as to prevent them from swallowing the rule and rendering the Convention a dead letter." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358-59 (11th Cir. 2021) (internal quotation omitted). Even if an exception is established, however, a district court retains broad discretion to order the return of a child if doing so would further the aims of the Convention. *See* Convention, art. 18; *Lozano v. Montoya Alvarez*, 572 U.S. 1, 20 (2014) (Alito, J. concurring) ("A court thus has the power to order the child's return in the exercise of its sound discretion even where Article 12's obligation to order such return no longer applies.").

## IV.    CONCLUSIONS OF LAW

Based on the foregoing findings of fact and legal standards, the Court makes the following conclusions of law.

### A.    Prima Facie Case of Wrongful Retention

The Court finds that Petitioner has established his prima facie case under the Convention.

#### 1.    Habitual Residence

The evidence clearly establishes that Colombia is JQG's country of habitual residence. Although the Convention does not define "habitual residence," the Eleventh Circuit "has looked to whether a child has lived in the place with a sufficient degree of continuity to be properly described as *settled*." *Horacius v. Richard*, No. 24-10801, 2024 WL 3580772, at *4 (11th Cir. July 30, 2024) (emphasis in original) (internal quotations omitted). JQG's life in Colombia was continuous and settled before he came to the United States. His family, including grandparents,

aunts, uncles, and cousins were in Bucaramanga. He attended school and engaged in extracurricular activities there. Indeed, JQG had never known life outside of Colombia. Accordingly, the Court finds that Colombia is JQG's country of habitual residence.

### 2. Rights of Custody

The evidence also establishes that Respondent breached Petitioner's rights of custody when she retained JQG in the United States.

The Court looks to the Convention to determine whether a petitioner has a "right of custody" and to Colombian law to determine the "content" of Petitioner's rights. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010). Under the Convention, "rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). "[T]he violation of a *single* custody right suffices to make removal of a child wrongful." *Hanley v. Roy*, 485 F.3d 641, 647 (11th Cir. 2007) (internal quotation omitted) (emphasis in original). "[A] parent need not have custody of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a *sole* or even *primary* right of custody." *Id*. (emphasis in original).

Here, Colombian law clearly provides Petitioner with custody rights over JQG. Parents in Colombia share joint responsibility and authority in raising their children.[14] Moreover, a parent is prohibited from removing a minor from Columbia without permission from the other parent.[15] The parties' Conciliation Agreement adopted this legal requirement by prohibiting Respondent from

---

[14] Colombian law provides that "parents . . . share the personal care of the upbringing and education of their children[]" and that "[t]ogether, the parents are responsible for exercising parental authority over their children." Colombian Civil Code Arts. 253 and 288 [ECF No. 58-2 at 1, 5].

[15] Colombian law provides that "[w]hen a child or adolescent who has residence in Colombia is going to leave the country with one of the parents . . . [the departing parent] must previously obtain the permission of the person with whom he/she will not travel . . . Said permit must contain the destination, the purpose of the trip and the date of departure and entry back into the country." Colombian Childhood and Adolescence Code, Art. 110 [Ex. 58-2 at 4].

10

bringing JQG to any city in Colombia (other than Bucaramanga) or abroad without Petitioner's consent. Accordingly, under Colombian law and the Conciliation Agreement, Petitioner has the joint right to determine JQG's place of residence and to prevent JQG's removal from Colombia. *See e.g. Abbott*, 560 U.S. at 10-11 ("Mr. Abbott's *ne exeat* right gives him both the joint 'right to determine the child's place of residence' and joint 'rights relating to the care of the person of the child'" and, thus, "is a right of custody under the Convention") (quoting Convention art. 5(a)). Respondent's retention of JQG in the United States beyond July 17, 2023, therefore, violated Petitioner's custody rights.

### 3. Exercising Rights of Custody

"[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Horacius v. Richard*, 720 F. Supp. 3d 1287, 1298 (S.D. Fla. 2024) (internal quotation omitted). To establish that he exercised his rights of custody, Petitioner must only show that he kept, or sought to keep, "any sort of regular contact with" JQG. *In re S.L.C.*, 4 F. Supp. 3d 1338, 1348 (M.D. Fla. 2014).

Petitioner has established that he was exercising his rights of custody over JQG prior to JQG's arrival in the United States. As detailed above, JQG routinely visited Petitioner and would stay with Petitioner for weekends and holidays and when Respondent traveled to the United States. Petitioner paid Respondent monthly child support and paid for JQG's healthcare coverage, private school tuition, and extracurricular activities. Petitioner often took JQG to school and other activities and they would watch movies, go hiking, and play soccer. In short, Petitioner was a parent to, and exercised his custody rights over, JQG.

Accordingly, the Court finds that Petitioner has proven his prima facie case of wrongful removal under the Convention.

B.     **Exceptions to Return/Affirmative Defenses**

Respondent argues that the consent, well-settled child, grave risk of harm, and mature child exceptions apply. The Court addresses each in turn.

1.     **Consent**

In her Answer, Respondent claimed that Petitioner consented to JQG's removal from Colombia. This argument is a non-starter. While Petitioner agreed to let JQG come to the United States for a short vacation, the Travel Authorization clearly indicated that Respondent only had Petitioner's consent through July 17, 2023. Accordingly, the Court finds that Respondent has not established the consent exception.

2.     **Well-Settled Child**

Respondent argues that JQG is "well-settled" in the United States such that he should not be returned to Colombia. The well-settled exception applies where (i) the proceedings seeking the child's return were commenced more than one year after the date of the wrongful removal, and (ii) the respondent has shown by a preponderance of the evidence that "the child is now settled in its new environment." Convention, art. 12. "This exception accounts for the reality that at some point a child may become so settled in a new environment that return is no longer in the child's best interests." *Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018).

It is undisputed that Petitioner filed this action more than one year after the date of the wrongful removal, therefore the Court need only determine whether JQG is settled in the United States. The Convention does not define "settled." However, the Eleventh Circuit has held that a child is "settled" when he "has significant connections to [his] new home that indicate that [he]

12

has developed a stable, permanent, and nontransitory life in [his] new country to such a degree that return would be to the child's detriment.'" *Cuenca v. Rojas*, 99 F.4th 1344, 1350 (11th Cir. 2024) (quoting *Fernandez*, 909 F.3d at 361). "In making this determination, courts must carefully consider the totality of the circumstances, including evidence of the child's significant connections to the new country as well as evidence of continuing contacts with and ties to his or her State of habitual residence." *Id.* (internal quotation omitted). The Court may consider several factors to determine whether a child is settled, including:

> (1) whether the child is old enough to form attachments beyond the parent or guardian with whom he lives; (2) the duration and stability of the child's residence in the new country; (3) whether the child has friends and relatives in the new environment; (4) whether the child regularly attends school or daycare; (5) the child's participation in community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the child and respondent's immigration status.

*Id.* at 1350-51.

The Court finds that Respondent has not met her burden of establishing that JQG is well-settled in the United States. First, JQG's housing does not suggest a stable environment. Respondent and JQG have lived in four different residences since arriving in the United States. Respondent does not have a formal lease or rental agreement for her current apartment and recently told a therapist that she was experiencing housing instability.

Second, JQG's three friends in Miami are of Hispanic descent (with at least two of them being of Colombian descent). In Dr. Firpi's expert opinion, a child that is well-integrated socially "is engaging in activities with different elements and different kinds of people in the community . . . [and] learn[ing] to deal with people of different origins, different ethnic backgrounds, different socioeconomic status and they – they kind of integrate on a social level, which is important for kids." [ECF No. 53 at 119:12-18]. Based on JQG's inability to integrate himself well into the broader community, Dr. Firpi concluded that JQG was not well settled, but rather, "in the process

13

of adjustment." *Id.* at 20:19-21. While the Court does not give this factor great weight, it is notable that JQG's closest friends are Colombian.

Third, Respondent does not have a Florida driver's license or own a car. This immobility somewhat prevents JQG from integrating himself further into the broader community and limits the kinds of activities in which he can participate.

Fourth, JQG was absent from school twenty (20) times and tardy fifty-six (56) times over the past two school years. These routine absences and tardies reflect instability in JQG's life and weigh against a finding that he is settled.

Fifth, JQG has not seen a physician or a dentist for care since coming to the United States in June 2023. JQG's lack of routine, preventative medical care indicates that he is not settled here.

Sixth, JQG has no extended family members in Miami and, therefore, has no family support network beyond his mother on which to rely. Conversely, he has a tremendous amount of family support, both on his mother's and father's sides, in Colombia.

Finally, JQG's immigration status is uncertain. *See* [ECF No. 58-25 at 15]. "[A] child's lack of permanent legal status in the United States can have a negative impact on his ability to establish a stable, permanent, and nontransitory life in this county, especially if removal seems imminent." *Cuenca*, 99 F.4th at 1351.[16] Although Respondent has a pending asylum application, that application has not yet been decided.[17] In Dr. Firpi's expert opinion, it is difficult for a child to be well-settled with an uncertain immigration status because "practically, [the child is] facing deportation at any unpredictable moment." [ECF No. 53 at 115:11-15]. While not dispositive,

---

[16] While a child's lack of permanent legal status in the United States is a factor in determining whether he is settled, the Eleventh Circuit has "decline[d] to state categorically that a child without permanent legal immigration status cannot become 'settled" in the United States within the meaning of the Convention." *Cuenca*, 99 F.4th at 1350.

[17] It is not for this Court to determine the merits of Respondent's asylum application. The Court notes, however, that the current administration recently halted all asylum claim determinations and has made obtaining a grant of asylum more difficult. JQG is clearly aware of the uncertainty of he and his mother's immigration status and is afraid that Petitioner is trying to have Respondent removed.

JQG's immigration status weighs against finding him settled.

The Court recognizes that JQG has started to adjust to life in Miami. He has a few friends, participates in one or more extracurricular activities, and attends school—albeit with excessive absences. However, the Court cannot find that JQG "has developed a stable, permanent, and nontransitory life in [his] new country." *Fernandez*, 909 F.3d at 361. Rather, most of the evidence shows that JQG's life in Miami is unsettled. In particular, JQG's less-than-permanent housing, immigration status, lack of routine medical care, and isolation from extended family suggests that he, at best, is in a state of transition.[18] Accordingly, Respondent has failed to establish the well-settled exception to return.[19]

### 3. Grave Risk of Harm

Respondent also argues that JQG faces a grave risk of harm if he returns to Colombia. The Convention provides an exception to a child's repatriation where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). Respondent must prove this exception by clear and convincing evidence, 22 U.S.C. § 9003(e)(2)(A), and show that "the risk to the child is grave, not merely serious." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016) (internal quotation omitted). "[O]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable

---

[18] The Court also considered Dr. Firpi's expert assessment that JQG is not well-settled in Miami. *See* [ECF No. 58-23 at 14-15].

[19] The Court notes that the State Department sent the first of four Voluntary Return Letters to Respondent on June 25, 2024, eleven months after the wrongful retention, and within the one-year window contemplated by the Convention. Though it has now been over two years since JQG's wrongful retention in the United States, the court may consider, in its well-settled determination, the reasons for further delay. *See Fernandez*, 909 F.3d at 361 n.5 ("The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition.") (internal quotation omitted). Here, the delay was due to Respondent's refusal to comply with the Voluntary Return Letters and not Petitioner's neglect or lack of diligence.

situation is material to the court's determination." *Id.* at 1012 (internal quotation omitted). Moreover, the focus must be on a grave risk of harm to JQG and not the Respondent. *In re S.L.C.*, 4 F. Supp. 3d at 1350 ("Only severe potential harm to the child will trigger this Article 13(b) exception.").

At the final hearing, Respondent suggested that the January 2018 incident, other unspecified abuse against her, and the alleged sexual assault by Yeny's former boyfriend puts JQG at a grave risk of harm should he return to Colombia.

        **a.**    **2018 Incident**

The 2018 incident does not demonstrate that JQG face a grave risk of harm in Colombia. First, it took place nearly 8 years ago and outside of the presence of JQG. Both Petitioner and Respondent participated in the altercation and, although Respondent had the opportunity to pursue her criminal complaint against Petitioner, she failed to appear for the hearings on her complaint and on Respondent's complaint. Moreover, after the 2018 incident, JQG continued to visit Petitioner in Bucaramanga with Respondent's consent. While no act of aggression is acceptable, the 2018 incident appears to be a limited and isolated event with had no impact on JQG.

        **b.**    **Other Acts of Violence.**

Although Respondent and her mother testified that Petitioner abused Respondent when JQG was an infant and that Respondent fled to Bogota because of this abuse, the Court does not find their testimony credible. Indeed, in her interview with Dr. Firpi, Respondent stated that (1) Petitioner never hit her, (2) she moved to Bogota to pursue a job, and (3) she came to the United States not because of any alleged abuse, but because it was the land of opportunity. And, unlike the 2018 incident, Respondent did not file a police report or seek protective measures following any alleged abuse before her move to Bogota. Respondent's mother, testifying by Zoom from

16

Colombia, provided no details about this alleged abuse and later conceded that she unaware that Respondent had told Dr. Firpi that Petitioner had never hit her. Respondent's story repeatedly changed as the case progressed in what appears to be an attempt to paint Petitioner as a violent man and a threat to JQG.[20] Respondent and her mother's inconsistent and vague testimony, without more, is not persuasive, let alone clear and convincing, evidence that JQG faces a grave risk of harm in Colombia.

Moreover, there is no evidence showing that Petitioner ever acted violently towards JQG. Indeed, JQG told Dr. Firpi that Petitioner had never hurt him and that he had never seen Petitioner hit his mother.[21]

### c. Alleged Sexual Assault

Respondent and her mother also testified that Yeny's former boyfriend sexually assaulted JQG when JQG was visiting his father. While these are serious allegations, the Court finds that they are not credible.[22] Respondent did not raise the alleged assault in her Answer or Amended Answer as a basis for her grave risk of harm exception. And, neither Respondent nor JQG told Dr. Firpi about the alleged assault. On the other hand, Petitioner testified that Respondent never told him about the alleged assault and Yeny testified that JQG was never alone with her boyfriend. At bottom, Respondent's story is not credible and, therefore, cannot establish that JQG is at a grave risk of harm if he returns to Colombia.

---

[20] Respondent alleged in her Answer that Petitioner has a history of substance use, [ECF No. 14], but did not repeat that allegation in her Amended Answer, [ECF No. 21]. Even if she had, there is no evidence in the record to support a finding that Petitioner has a substance abuse problem.
[21] JQG did state that his father had yelled at his mother and sometimes threw things. He also told Dr. Firpi that his mother sometimes pinched him.
[22] Respondent also alleged that Yeny's boyfriend's teenage son bullied JQG. The Court does not find this testimony to be credible.

####     4.     Mature Child

Respondent also raises the mature child exception. A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13. "Courts have relied primarily on three considerations in determining when this exception applies: (1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence." *Romero v. Bahamonde*, 857 F. App'x 576, 583 (11th Cir. 2021).

The Court does not find that JQG is sufficiently mature enough to take his objections into account. While some "courts have found children as young as eight sufficiently mature[,]" and the Convention does not set a minimum age, "courts most often apply the mature-child exception to children over the age of 12." *See Bassat v. Dana*, No. 24-24340, 2025 WL 742759, at * 10 (S.D. Fla. Mar. 7, 2025) (overruled on other grounds by *Bassat*, 2025 WL 2304896, at *9 ). The evidence presented at trial demonstrates that JQG is a polite and friendly kid of normal intellect who loves his parents. Nothing in the record suggests, however, that he is exceptionally mature. He is just an eleven-year-old child being asked to make an extraordinary choice. Without more, the Court cannot find that he is sufficiently mature for the exception to apply.

Even if JQG were mature enough for the Court to take his views into account, he does not appear to have a solid objection to returning to Colombia. "The text of the Convention restricts the age and maturity exception to cases in which the child 'objects' to being returned. A preference is not an objection." *Rodriguez v. Yanez*, 817 F.3d 466, 476-77 (5th Cir. 2016). Dr. Firpi noted repeatedly that JQG has not indicated a well-founded objection to returning to Colombia. *See* [ECF No. 58-25 at 14] ("[A]lthough the child has now expressed a preference to stay in the United States

to be with his mother and seeking a better life, the child did not articulate any well-founded objection to return to Colombia"). At most, JQG has indicated a preference to remaining in the United States to take advantage of its opportunities to go to college and to be with Respondent. A preference is not an objection.

JQG has also wavered between wanting to return to Colombia and wanting to stay in the United States. Indeed, in the recorded calls with Petitioner, the Court heard JQG pleading with his father (and on one occasion, his maternal grandmother) to return to Colombia. Even Respondent acknowledged at the Final Hearing that JQG had routinely changed his mind on where he wanted to live. JQG's wavering ties into the Court's earlier finding—he is not mature enough to navigate his parents' wishes,[23] promises of better opportunities, and ties to his old and new homes. Accordingly, the Court finds that JQG has not reached the level of maturity such that his objections should be considered. And, even if he had, the Court is not convinced that JQG actually objects to returning to Colombia.

## V. CONCLUSION

Based on the foregoing, the Court finds that Respondent wrongfully retained JQG in the United States and has not met her burden of proving any of the exceptions. Therefore, it is

**ORDERED AND ADJUDGED** as follows:

1. Petitioner's Verified Petition for the Return of Minor Child to Colombia Pursuant to the Hague Convention on International Child Abduction, [ECF No. 1], is **GRANTED**.

2. Respondent shall ensure that JQG travels to Colombia on a flight departing on or before January 1, 2026, accompanied by an appropriate caregiver.

---

[23] The Court does not opine on whether Respondent has unduly influenced JQG's preferences. However, the record reflects that she has, at the very least, exerted some influence.

3. On or before December 17, 2025, Respondent shall file a notice advising the Court of the logistical details of JQG's return travel to Colombia, including the date and time of travel and the name of the caregiver accompanying him.

4. The Clerk of Court is directed to release JQG's Colombian passport to Petitioner's counsel and release Respondent's Colombian passport to her.

5. Respondent shall not remove JQG from the Southern District of Florida other than to return him to Colombia.

6. The Court retains jurisdiction to ensure compliance with this Order.

7. This case is closed for administrative purposes.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 10th day of December, 2025.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE